# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 24-0555V**

| | |
|---|---|
| JASON ALTSCHULER,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: July 15, 2026 |

*John Robert Howie, Howie Law, PC, Dallas, TX, for Petitioner.*

*Joseph Douglas Leavitt, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND PARTIAL RULING ON DAMAGES[1]

On April 10, 2024, Jason Altschuler filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of a tetanus/diphtheria/acellular pertussis ("Tdap") vaccine received on April 20, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties were unable to settle the claim, and have now briefed entitlement and damages (ECF Nos. 21, 23, 24). For the reasons set forth below, I find that Petitioner's Tdap vaccine was likely administered in his right arm, and that he is otherwise entitled to compensation. For damages, I find that Petitioner is entitled to an award of **$80,000.00** for actual pain and suffering, plus **$4,605.92** for past unreimbursable expenses. I also determine that Petitioner is entitled to a portion of his requested lost earnings, with the sum to be calculated by the parties in accordance with this Ruling.

## I. Factual Evidence

### A. Medical Records

On April 20, 2021, Petitioner received a Tdap vaccine during an emergency department ("ED") visit following an injury to his finger. Ex. 2 at 1; Ex. 3 at 12, 14. Although the vaccination record states that the vaccine was administered in his *left* deltoid (Ex. 2 at 1), Petitioner asserts that it was actually administered in his *right* arm.

Six days later (April 26, 2021), Petitioner returned to the ED complaining of fever, body aches, and "[s]evere pain in *right arm* from shot." Ex. 3 at 45, 46 (emphasis added). Petitioner thought his symptoms might have resulted from the Tdap vaccine he had received at his prior visit. *Id*. at 46. The examination and treatment provided at this encounter focused on his injured finger and the possibility of infection, and it appears that Petitioner's arm was not examined or treated.

Two days later (April 28, 2021), Petitioner saw his primary care provider ("PCP") to follow up on his finger injury and for "[p]ain in [a]rm [a]fter [t]etanus [s]hot." Ex. 4 at 13. On examination, his right arm exhibited pain with palpation to the upper bicep tendon, as well as painful extension and rotation. *Id*. He was assessed with right arm pain and polyneuropathy, and given medication and a neurology referral. *Id*. at 14.

On May 4, 2021, Petitioner saw a neurologist reporting "right shoulder pain that began after a tetanus shot on 04/20/21." Ex. 5 at 5. Petitioner noted that the injection was placed too high and he felt discomfort during administration of the vaccine. *Id*. Since that time, he had experienced a sharp stabbing pain that was exacerbated by any movement. *Id*. On examination, the neurologist noted tenderness to palpation around the rotator cuff and "exquisite tenderness at the junction of the humerus and the shoulder where the injection was placed." *Id*. The neurologist suspected SIRVA and arranged for Petitioner to see an orthopedist that day. *Id*. at 6.

On the same day (May 4, 2021), Petitioner saw orthopedist Brett Hall, M.D. Ex. 6 at 3. He reported right shoulder pain that "started after he got a tetanus injection into the right shoulder." *Id*. Since that time, he had experienced progressive pain in his right shoulder and decreased range of motion ("ROM"). *Id*. Dr. Hall thought "it is possible that

the vaccination went into the subacromial space as opposed to being intramuscular based on the symptoms that he is having," including "quite a bit of bursitis and irritation in his shoulder." *Id*. at 5. He recommended an MRI, and placed Petitioner off work duties. *Id*.

The following week (May 12, 2021), Petitioner saw orthopedist Nicolas S. Bonnaig, M.D., for a second opinion. Ex. 7 at 19. He complained of severe right shoulder pain he rated eight out of ten, which started on April 20, 2021 "after having a tetanus shot in his right arm." *Id*. Since vaccination, he had experienced constant pain that was aggravated by overhead motion and reaching. *ID*. On examination, Petitioner's right shoulder active ROM was 90 degrees in forward elevation. *Id*. Petitioner was assessed with rotator cuff tendinitis and subacromial impingement of the right shoulder, and given medication and a physical therapy ("PT") referral. *Id*. at 20. He was instructed not to work for three weeks. *Id*.

Petitioner underwent a PT evaluation on May 24, 2021. Ex. 8 at 13. He reported the "onset of right shoulder pain on 4/20/21, following Tdap injection."[3] *Id*. He rated his pain seven out of ten, and described it as a constant ache at rest and sharp pain with movement. *Id*. He reported "waking up throughout the night" due to pain. *Id*. On examination, his right shoulder active ROM was 130 degrees in flexion, 100 degrees in abduction, and 60 degrees in external rotation, and his right shoulder exhibited reduced strength. *Id*. at 15. He continued PT through June 17, 2021, attending a total of seven sessions between May 24 and June 17, 2021. *Id*. at 13-46. On June 17th, he reported a pain level of nine out of ten and minimal change, and requested that he be discharged. *Id*. at 41-42.

Petitioner returned to Dr. Bonnaig on June 3, 2021, reporting that he continued to experience pain that was worsening despite two weeks of PT. Ex. 7 at 22. An MRI was ordered. *Id*. at 23. The MRI showed a small labral tear, presumably reactive edema in the head of the humerus, moderate tendinosis of the infraspinatus, and acromioclavicular arthritis. *Id*. at 24.

On August 3, 2021, Petitioner followed up with Dr. Bonnaig to review the MRI. Ex. 7 at 25. Dr. Bonnaig assessed him with right shoulder subacromial impingement, right rotator cuff tendinitis, and a tear of the right glenoid labrum, and administered a steroid injection and recommended more PT. *Id*. at 25-26. Dr. Bonnaig did not think vaccination had caused the MRI findings, but added that "it is certainly likely that having a shot caused pain in his shoulder." *Id*. at 26. Petitioner was directed to remain off work for another four weeks to rehabilitate his shoulder. *Id*.

---

[3] As Petitioner notes, this and some other records inaccurately identify the date of vaccination as April 18, 2021.

On August 12, 2021, Petitioner underwent a PT re-evaluation. Ex. 8 at 47. He rated his pain three out of ten at rest and eight out of ten with activity. *Id*. The steroid injection he received the previous week resulted in "minimal improvement in symptoms." *Id*. at 48. His right shoulder active ROM had worsened, and was now 110 degrees in flexion, 90 degrees in abduction, and 55 degrees in external rotation, and he continued to exhibit decreased strength. *Id*. at 49. Petitioner attended six PT sessions between August 12 and September 9, 2021. Ex. 8 at 47- 79. On September 9, 2021, Petitioner reported improved strength but worsening of his pain in both intensity and frequency. *Id*. at 74.

Petitioner saw Dr. Bonnaig on September 17, 2021. Ex. 7 at 28. He reported pain, weakness, and limited ROM that was "not any better." *Id*. The steroid injection had provided no relief, and he had been taking Tylenol and doing PT. *Id*. He remained out of work. *Id*. Petitioner was given medication and instructed to remain off of work for another four weeks. *Id*. at 29. Petitioner attended six more PT sessions between September 23 and October 13, 2021. Ex. 8 at 81-112.

On October 15, 2021, Petitioner followed up with Dr. Bonnaig concerning his right shoulder pain. Ex. 7 at 31. He reported a "40% improvement in symptoms," though he continued to experience pain with cross body motion and overhead motion, as well as stiffness and weakness. *Id*. He was instructed to continue PT and remain out of work for another six weeks. *Id*. at 32.

Petitioner attended five additional PT sessions between October 15 and November 10, 2021. Ex. 8 at 114-138. At his final PT session on November 10th, he reported a pain level of seven out of ten, ranging from one or two at rest to seven or eight with activity. *Id*. at 133. He reported "minimal change" in symptoms, with continued mild to moderate right shoulder pain and difficulty with dressing, meal preparation, sleeping, and household chores. *Id*. at 134. His active ROM was now 140 degrees in flexion, 130 degrees in abduction, and 50 degrees in external rotation. *Id*. The therapist noted that Petitioner had attended 24 PT sessions, and was now being discharged "due to insurance authorization issues." *Id*. at 136.

Petitioner saw Dr. Bonnaig on November 30, 2021, reporting "no significant change in his symptoms," with superior shoulder pain and increasing pain at night, though his ROM had improved. Ex. 7 at 34. Dr. Bonnaig administered another steroid injection, and offered surgery as an option if his symptoms persisted. *Id*. at 35.

### B. Testimonial Evidence

Petitioner filed two declarations in support of his claim. Exs. 1, 17. He states that the Tdap vaccine was administered into his right arm on April 20, 2021. Ex. 1 at ¶ 2. Before vaccination, the nurse began to prepare his right shoulder for vaccination, leading Petitioner to ask whether the vaccine should be administered in his left shoulder, because his hand injury was to his left hand. *Id*. at ¶ 4. The nurse responded that it did not matter,

and continued preparing his right arm, then administered the vaccine into his right shoulder. *Id*.

Petitioner states that on the evening of vaccination, he began to experience a dull ache in his right shoulder and upper arm. Ex. 1 at ¶ 5. Initially, he thought it was normal post-vaccination pain that would improve on its own. *Id*. Instead, it worsened, and he began to experience significant difficulty raising his right arm due to severe pain. *Id*. When he developed other symptoms, including a high fever, he returned to the ED. *Id*.

Petitioner states that at the time of his injury, he worked full time as a butcher, for which he was paid $13.00 per hour. Ex. 17 at ¶ 2. His job entailed moving large cases of meat, which he was unable to do after his shoulder injury. Ex. 1 at ¶ 35. He lost his job due to his injury, and did not return to work until February 2022 when he was hired by a landscaping company. *Id*. At the time of his injury, his health insurance plan had a "very high deductible," making the medical bills a hardship and pushing him further into depression. Ex. 17 at ¶ 3.

Petitioner states that his injury has had a "significant negative impact" on his life. Ex. 17 at ¶ 5. He was unable to work and had to borrow money from his parents for bills, which was "humiliating" as an adult. *Id*. He was unable to participate in activities and hobbies due to constant pain and lack of income, leaving him in a "deep state of depression." *Id*.

Petitioner states he has lost "a significant amount of mobility" in his right shoulder due to his injury. Ex. 17 at ¶ 7. He was unable to drive for months, making him dependent on others for transportation, and needed assistance for dressing for the first few months after his injury. *Id*. When he lost his job due to his injury, he was left with no income for expenses, furthering his depression. *Id*. at ¶ 8.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and

contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs*., No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs*., No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B. Parties' Arguments on Entitlement

The sole disputed entitlement issue concerns the situs of vaccine administration.[5] The vaccination record documents a left arm situs, while Petitioner contends the vaccine was administered into his right arm. Petitioner's Motion for Ruling on the Record, filed Mar. 19, 2025, at *30-38 (ECF No. 21) ("Mot."). Petitioner emphasizes that he reported his injury to a medical provider just six days after vaccination, identifying his vaccinated right arm as the locus of pain. Mot. at *30. Thereafter, as he sought care, he consistently related his right shoulder pain to vaccination. *Id*. at *30-34. And no records other than the vaccination record suggest the vaccine was administered in his left arm. *Id*.

Respondent argues that the vaccination record plainly states that the vaccine was administered in Petitioner's left deltoid. Response, filed June 17, 2025, at *8-9 (ECF No. 23) ("Resp."). As a contemporaneous medical record created by a disinterested person, that record is entitled to consideration as trustworthy evidence. *Id*. In contrast, the records identifying Petitioner's right arm as the vaccination situs reflect statements of Petitioner rather than independent knowledge. *Id*. The vaccination record is the "only record containing information about the site of vaccination from a disinterested person who actually witnessed the administration of the vaccine." *Id*. at *9.

### C. Factual Findings Concerning Situs

The record preponderantly supports a finding that Petitioner's Tdap vaccine was likely administered into his right shoulder, as alleged. Although the vaccination record documents a left-sided situs, *all other* evidence supports a right-sided situs. Petitioner reported his right shoulder injury to a healthcare provider just six days after vaccination, and related his pain to vaccination in that arm. Thereafter, he consistently reported that the vaccine was administered in his right shoulder, resulting in pain. And no other records suggest a left-sided vaccination.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The QAI and statutory requirements are not otherwise disputed, and I find that they

[5] I appreciate Respondent's decision to withdraw his onset objection after Petitioner highlighted compelling evidence.

are satisfied. The record does not contain preponderant evidence that Petitioner had a history of right shoulder pain, or another condition, that would explain his post-vaccination symptoms. Ex. 4. He experienced the onset of shoulder pain within 48 hours of vaccination. Ex. 3 at 45; Ex. 6 at 3; Ex. 7 at 19; Ex. 8 at 13. He exhibited reduced ROM, and his symptoms were limited to the shoulder in which the vaccine was administered. Ex. 6 at 3; Ex. 7 at 19; Ex. 8 at 13. He experienced residual effects of his condition for more than six months. Ex. 7 at 34-35; Ex. 8 at 119-38. He received a covered vaccine in the United States. Ex. 2 at 1. And he states that he has never received compensation in the form of an award or settlement for his vaccine injury, nor has he filed a civil action. Ex. 1 at ¶ 37.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, he has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs*., No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $80,000.00, relying on decisions in

---

[6] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

*Coluccio* and *Williams*, in which claimants received that amount.[7] Mot. at *38-44. Petitioner asserts that he treated his injury for seven and a half months, with two steroid injections, 24 PT sessions, an MRI, multiple prescription medications, an ED visit, and consultations with orthopedists, a neurologist, and his PCP. *Id*. He sought care just six days after vaccination, suggesting a more severe injury. *Id*.

Petitioner also seeks lost wages in the amount of $15,381.86 (which he asserts was calculated net of taxes). Mot. at *44-46. Prior to his injury, Petitioner worked full time as a butcher, earning $13.00 per hour. *Id*. at *44. Due to his injury, he was unable to perform his job duties, and ultimately lost his job. *Id*. He did not obtain employment again until February 2022, when he was hired by a landscaping company. *Id*.

Respondent proposes a pain and suffering award of no more than $72,500.00, relying on decisions in *Callejas* and *Killpack*, in which the petitioners were awarded $67,500.00 and $73,000.00, respectively.[8] Resp. at *10-13. Respondent views Petitioner's clinical course as mild, continuing for slightly longer than seven months and limited to medications, injections, and PT. *Id*. at *11.

With respect to lost wages, Respondent does not dispute Petitioner's calculations, but asserts that Petitioner has not established that he is entitled to lost wages in the first place. Resp. at *14. Respondent argues that the Vaccine Act contemplates compensation for lost wages only if the vaccinee's earning capacity is impaired. *Id*. Although Petitioner cites medical records noting that he could not perform his duties as a butcher, Respondent asserts that this may demonstrate that he was unable to work at that particular job, but does not establish that his earning capacity was impaired or limited in any way. *Id*. And Petitioner has not shown why he was unable to find another job with comparable pay that did not require the same physical labor as working as a butcher. *Id*. Respondent states that Petitioner's "inability to find alternative employment does not equate to his earning capacity being impaired." *Id*.

On reply, Petitioner observes that the parties are fairly close in their recommended pain and suffering awards. Reply at *6. And Petitioner asserts that the decisions Respondent cites, *Callejas* and *Killpack*, both involve significant differences from Petitioner's injury that would justify a higher award for Petitioner. *Id*. at *6-8.

Petitioner asserts that lost wages should be awarded because "the decision to stop working was fully supported by Petitioner's medical providers who deemed him unable to

---

[7] *Coluccio v. Sec'y of Health & Human Servs.*, No. 19-1684V, 2022 WL 17849579 (Fed. Cl. Spec. Mstr. Dec. 15, 2022) and *Williams v. Sec'y of Health & Human Servs.*, No. 19-1420, 20204 WL 914908 (Fed. Cl. Spec. Mstr. Jan. 30, 2024).

[8] *Callejas v. Sec'y of Health & Human Servs.*, No. 20-1767, 2023 WL 12073989 (Fed. Cl. Spec. Mstr. May 5, 2023), and *Killpack v. Sec'y of Health & Human Servs.*, No. 21-27V, 2023 WL 4312922 (Fed. Cl. Spec. Mstr. June 2, 2023).

perform his job as a butcher." Reply at *5-6. He asserts that he was "forced to stop working due to his injury," resulting in a loss of earning capacity. *Id*.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner suffered a moderate SIRVA that persisted for seven and a half months. He treated his condition with two steroid injections, 24 PT sessions, and medications, and underwent an MRI. He sought treatment promptly, going to the emergency department just six days after vaccination, reporting severe pain. He followed up with his PCP two days later, and the following week saw a neurologist and orthopedist. Thereafter, he continued treatment regularly, with no gaps. He reported severe pain levels, rating his pain eight out of ten at his May 12, 2021 orthopedic consultation. Ex. 8 at 13. His pain worsened, reaching nine out of ten in mid-June 2021. Ex. 8 at 41-42. By mid-August 2021, he rated his pain three out of ten at rest, and eight out of ten with activity. Ex. 8 at 47.

The first steroid injection reportedly provided "no relief" (Ex. 7 at 28). However, it appears that the second steroid injection at the end of November 2021 may have relieved Petitioner's pain, because he did not seek further treatment for his shoulder injury thereafter. I recognize that he stopped PT not because he had met his goals, but due to insurance limitations. At his final PT session, he rated his pain as ranging from one to two at rest to seven or eight with activity. Ex. 8 at 133.

I find the *Coluccio* and *Williams* decisions to be on point and good comparables. The petitioners in those cases, like Mr. Altschuler, suffered moderate injuries that persisted for about the same amount of time, and all of them treated their injuries with steroid injections and PT but not surgery. All three experienced severe pain levels at times, and all sought care less than a month after vaccination. The same sum that was awarded in those cases is appropriate here.

Taking these factors into consideration, an award of **$80,000.00** for pain and suffering is appropriate in this case.

### D. Appropriate Compensation for Lost Wages

The Vaccine Act provides compensation for lost wages as follows:

> In the case of any person who has sustained a vaccine-related injury after attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded,

> compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections.

42 U.S.C. § 300aa-15(a)(3)(A).

Accordingly, a prerequisite for a lost earnings award is a finding of impairment to earning capacity as a result of the vaccine-related injury, and compensation is limited to petitioner's "actual and anticipated loss of earnings." As the special master in *Brown v. Sec'y of Health & Hum. Servs.,* recognized, "the Vaccine Act requires that lost earnings be calculated in a cautious manner . . . ." No. 01-60V, 2005 WL 2659072, at *6-8 (Fed. Cl. Spec. Mstr. Sept. 21, 2005). As with other elements of damages, petitioner bears the burden of supporting his claim for lost earnings with preponderant evidence. 42 U.S.C. § 300aa-11(e); *see,* e.g., *Wilkerson v. Sec'y of Health & Hum. Servs.*, No. 90-822V, 1998 WL 106132, at *2 (Fed. Cl. Spec. Mstr. Feb. 24, 1998) ("petitioner [], as in any claim brought before this forum, has the obligation to prove her case, and that proof includes a preponderance of evidence on the issue of reasonable damages.").

Petitioner worked in a physically-demanding job as a butcher prior to his injury. At his first orthopedic appointment on May 4, 2021, he was directed not to work due to his shoulder injury. Ex. 6 at 5. The record supports a finding that he was subsequently instructed to remain out of work through November 26, 2021.[9] Ex. 7 at 20, 26, 29, 32. After that date, however, the record is bereft of evidence supporting an impaired earning capacity. Thus, I agree that Petitioner should be compensated for lost wages through November 26, 2021, although he has not substantiated a loss of earning capacity beyond that point.

The parties are directed to calculate Petitioner's lost wages (minus taxes) through November 26, 2021 and submit that sum, after which I will issue a decision.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that**

[9] On May 12, 2021, Petitioner was directed not to work for three weeks. Ex. 7 at 20. On August 3, 2021, Petitioner was instructed to remain off work for another four weeks. *Id.* at 26. On September 17, 2021, he was instructed to remain out of work for four additional weeks. *Id.* at 29. On October 15, 2021, Petitioner was directed to remain out of work for another six weeks, e.g., until November 26, 2021. *Id*. at 32.

**Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. $80,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[10] **Additionally, Petitioner is entitled to $4,605.92 in unreimbursable expenses.**[11]

**I also find that Petitioner is entitled to lost wages calculated through November 26, 2021. Petitioner shall file, by no later than Tuesday, August 11, 2026, a joint status report setting forth a specific amount for Petitioner's lost wages for this time period, minus applicable taxes that would have been deducted from these earnings. Thereafter, I will issue a final damages decision.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[10] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[11] The parties agree that this sum is reimbursable. Mot. at *1; Resp. at *10.